**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COURT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| PHOENIX ENTERTAINMENT PARTNERS, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>CTHS, INC. and GREGORY TRAINI d/b/a KISS DJ & KARAOKE<br><br>        Defendants. | Case No.:<br><br><br>**COMPLAINT**<br>**TRADEMARK INFRINGEMENT, § 15 U.S.C. 1114**<br>**UNFAIR COMPETITION, § 15 U.S.C. 1125**<br>**VIOLATION OF SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-20, et. seq.**<br><br>**NON- JURY** |

The Plaintiff, Phoenix Entertainment Partners, LLC (hereinafter "PEP"), by its undersigned counsel, hereby complains of the Defendants, CTHS, Inc. (hereinafter "CTHS") and Gregory Traini d/b/a Kiss DJ & Karaoke (hereinafter "Traini" and collectively with CTHS, the "Defendants") and for its Complaint alleges as follows:

**JURISDICTION AND VENUE**

1.      This is an action for trademark infringement and unfair competition arising under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125.  This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

2.      This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to PEP's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3.      This action also includes a claim that Defendants violated the South Carolina Unfair Trade Practices Act., S.C. Code Ann. §§ 39-5-20, *et. seq*.

4.      This Court has supplemental jurisdiction over the subject matter of PEP's state law claim pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to PEP's federal claims that they form part of the same case or controversy.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in this State and judicial district.

6.      This Court has personal jurisdiction over each of the Defendants, in that each of them resides in this State and judicial district and conducts significant business here, and in that the acts of which Defendants stand accused were undertaken in this State and judicial district.

## THE PLAINTIFF

7.      Plaintiff PEP is a North Carolina limited liability company having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

8.      Upon information and belief, CTHS is a corporation organized under the State of South Carolina, which conducts business activities in and operates an eating and drinking establishment known as "Causeway Grill and Raw Bar" in Garden City, South Carolina.  CTHS is engaged in the business of providing karaoke entertainment in this State.

9.      Upon information and belief, Traini is an individual who conducts his business activities at least in Garden City, South Carolina.  Upon further information and belief, Traini resides in Horry County, South Carolina and is engaged in the business of providing karaoke entertainment in this State.

10.    The foregoing Defendants are collectively referred to as the "Defendants" and individually as a "Defendant."

## BACKGROUND FACTS

11.    The term "karaoke" means "empty orchestra" in Japanese.    Karaoke entertainment has grown into a multi-million dollar business in the United States.

12.    PEP is the owner of Sound Choice, a well-known and leading brand of karaoke accompaniment tracks that is particularly well known to commercial karaoke operations, including bars, restaurants, and other venues as described above.

13.    PEP has succeeded Slep-Tone Entertainment Corporation (hereinafter "Slep-Tone"), by assignment, in all interest in the Sound Choice brand.

14.    PEP, through its predecessor Slep-Tone, was one of the leading United States manufacturers of karaoke accompaniment tracks.

15.    PEP, through its predecessor Slep-Tone's manufacturing process, re-recorded popular songs in the style of a particular performer, but without the lead vocals, and synchronizing the music to a display of the lyrics in a manner that gives cues to the performer as to what and when to sing.

16.    Karaoke compact disc plus graphics or MP3 plus graphics recordings contain re-created arrangements of popular songs for use as accompaniment tracks.

17.    Typically, the lead vocal tracks in an accompaniment track are omitted so that a karaoke participant can sing along, as though he or she were the lead singer.  In other situations, the lead vocal track by a sound-alike artist might be included, and some formats allow the lead vocal to be selectively muted upon playback so that the accompaniment track may be listened to either with or without the lead vocals.

18.    The "graphics" portion of a karaoke recording refers to the encoding of the recording with data to provide a contemporaneous video display of the lyrics to the song, in order to aid the performer.

19.    This graphics data is also utilized to mark the accompaniment tracks with the Sound Choice trademarks and to cause the Sound Choice trademarks to be displayed upon playback.

20.    Entertainers who provide karaoke services in bars, restaurants, and other venues are known as karaoke jockeys ("KJs"), karaoke hosts, or karaoke operators.   The services provided by KJs or operators typically include providing the karaoke music and equipment for playback, entertaining the assembled crowd for warm-up purposes, and organizing the karaoke show by controlling access to the stage, setting the order of performance, and operating the karaoke equipment.

21.    Typically, a KJ or operator will maintain a printed catalog of songs available for performance in order to aid participants in selecting a song to sing.

22.    Legitimate KJs or operators purchase equipment and purchase or license compact discs containing accompaniment tracks and charge for the above-mentioned karaoke services.

23.    Many KJs or operators, obtain, copy, share, distribute and/or sell media-shifted copies of the accompaniment tracks via pre-loaded hard drives, USB drives, CD-R's, or the Internet.

24.    Some KJ or operators copy the accompaniment tracks from compact discs to computer hard drives or other media, an activity known as "media-shifting."

25.    In many cases, media-shifting also involves converting the compact disc files to a different format, such as from CD+G format to MP3G format or WAV+G format; this is referred to as "format-shifting."

26.    Both media-shifting and format-shifting involve the creation of copies of the original materials stored on the compact discs.

27.    Upon information and belief, and based upon investigation of their activities, the present Defendants are in possession of unauthorized media-shifted and format-shifted copies of karaoke accompaniment tracks which have been marked falsely with PEP's federally registered trademarks.

28.    PEP does not authorize media-shifting or format-shifting of its accompaniment tracks for any commercial purpose.  PEP does, however, tolerate media-shifting and format-shifting under very specific conditions.

29.    PEP's conditions for tolerance of media-shifting and format-shifting include, without limitation, that (a) that each media-shifted or format-shifted track must have originated from an original, authentic compact disc; (b) that the tracks from the original, authentic compact disc be shifted to one, and only one, alternative medium at a time; (c) that the KJ or operator maintain ownership and possession of the original, authentic compact disc for the entire time that the media-shifted or format-shifted tracks are in existence; (d) that the original, authentic compact disc not be used for any commercial purpose while its content has been shifted; and (e) that the KJ or operator notify PEP that he or she intends to conduct or has conducted a media-shift or format-shift, and submits to a verification of adherence to PEP's policy.

30.    Media-shifting or format-shifting that occurs outside the conditions of tolerance described above is entirely without authorization or tolerance.

31.     Each of the Defendants has been observed using media-shifted and/or format-shifted karaoke accompaniment tracks marked with PEP's registered trademarks for commercial purposes.

32.     Defendants have been observed displaying PEP's registered trademarks to their customers or potential customers for purposes of advertising to their customers the quality and superiority that is associated with PEP products.

33.     Defendants have been observed displaying the registered trademarks to attract more customers and retain loyal customers, all of whom recognize the quality and superiority of PEP products.   Defendants directly benefit from the advertisement of PEP's registered trademarks.

34.     Without exception, Defendants' media-shifting activities have been undertaken outside the conditions of tolerance described above.

35.     A karaoke accompaniment track that exists outside the conditions of tolerance described above and that has been marked with PEP's federally registered trademarks is a counterfeit.

36.     PEP and its affiliated companies pay statutory and negotiated royalties to the owners of copyright in the underlying musical works for their activities in legitimately creating, copying, distributing, and selling compact discs containing karaoke accompaniment tracks.

37.     Those persons, including Defendants, who illegitimately obtain, copy, share, distribute, and/or sell media-shifted copies of PEP's accompaniment tracks do not pay royalties to the owners of copyright in the underlying musical works.

38.     PEP and its affiliated companies have spent millions of dollars building and maintaining studios, hiring artists, building a distribution facility, paying royalties to copyright

owners, building a company that is capable of reliably producing high-quality karaoke versions of current and historical musical hits and building a brand that is one of the pre-eminent brands in the industry.

39.    The widespread creation, distribution and commercial use of counterfeit copies of PEP's karaoke discs, including by these Defendants, has denied PEP the benefit of its investments.

40.    These counterfeits include PEP's registered trademarks, such that to the consumers of the illegitimate KJs' or operator's services, the counterfeits are virtually indistinguishable from genuine SOUND CHOICE® materials.

41.    For each of the most recent releases of new karaoke music by PEP, dozens of illegitimate copies of the contents of each disc have been created, on average, for each legitimate copy sold.  PEP, its affiliated companies, and its licensors have lost a considerable amount of money due to this widespread piracy.

42.    Such widespread illegal copying of music has been made possible by improving and ever cheaper computer technology and memory devices and the easy distribution of digital content over the internet.

43.    Widespread pirating of songs has contributed to the loss of more than seventy (70) jobs at PEP's predecessor Slep-Tone's location in Pineville, North Carolina, as well as several consecutive years of operating losses, as revenues do not cover fixed costs.

44.    Legitimate KJs or operators spend thousands of dollars acquiring PEP's accompaniment tracks, an irreducible overhead cost that must be recovered over a significant number of engagements.

45.     Illegitimate KJs or operators, including these Defendants, have an unfair advantage over legitimate KJs or operators because the illegitimate KJs or operators are able to provide karaoke services with a considerably lower overhead cost and significantly more songs through the pirating of PEP's tracks.

46.     Piracy, therefore, unfairly increases the profits of illegitimate KJs or operators and unfairly decreases the profits of legitimate KJs or operators, a condition that pressures legitimate KJs or operators to either commit piracy instead of doing business with PEP and other karaoke music producers or lose their shows to KJs or operators offering more songs at cheaper prices to the same venues.

47.     Because of piracy, it is nearly impossible for legitimate KJs or operators to compete against illegal KJs or operators, who are able to provide less expensive karaoke services and a greater number of tracks due to their lower overhead costs.

48.     Even when illegitimate KJs or operators have been forced through legal action or agreement to destroy their counterfeit copies of PEP's tracks, the illegitimate KJs or operators continue to engage in unfair competition using pirated materials belonging to other manufacturers.

49.     This unfair competition harms PEP, despite the elimination of counterfeit copies of PEP's tracks, because the continuing piracy of other manufacturers' tracks exerts continuing pressure upon PEP's customers and potential customers to commit piracy of PEP's tracks. Further, the greater number of tracks on pirate systems makes it more difficult for legal hosts to get hired and thus have the revenue to purchase PEP's products.

50.     In order to build a large library of PEP's accompaniment tracks, a legitimate KJ or operator could expect to spend approximately Twenty Five Thousand and no/100 Dollars

($25,000.00) for each karaoke system upon which that library would be used. For a comprehensive library of PEP's accompaniment tracks, that figure would rise to Forty Thousand and no/100 Dollars ($40,000.00) or more.

**PEP'S RIGHTS**

51.    PEP is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

52.    PEP is the owner of U.S. Service Mark Registration No. 4,099,045, issued February 14, 2012, for the trademark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows."

53.    PEP is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

54.    PEP is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in the preceding paragraph, for "conducting entertainment exhibitions in the nature of karaoke shows."

55.    PEP has, for the entire time its marks identified above ("the Sound Choice Marks") have been federally registered, provided the public, including Defendants, with notice

of those federal registrations through the consistent display of the symbol ® with its marks as used.

56.    Principally, the Sound Choice Marks are indicators of PEP as the origin of karaoke accompaniment tracks, meaning that those marks indicate that the tracks to which they are applied were made and distributed by PEP or at its direction and under its control.

57.    PEP is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress").  This distinctive and protectable trade dress includes, at a minimum, (a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the use of particular colors to display lyrics set against a black background; (c) the Sound Choice Marks; and (d) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

58.    PEP has used its trade dress continuously and substantially exclusively for a period of decades.

59.    The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of PEP as a source, effectively functioning as a visual trademark.

60.    The Trade Dress serves to distinguish PEP's tracks from the tracks of its competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by these Defendants are capable of identifying a particular karaoke track as originating with PEP simply by examining the Trade Dress or any significant portion thereof, whether or not the Sound Choice Marks are also displayed.

61.    The elements of the Trade Dress represent specific design choices by PEP; they are but one of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

62.    No competitor of PEP is required to use any element of the Trade Dress to accomplish the cueing function, and indeed all of PEP's known competitors are known to use other trade dress in accomplishing the cueing function.

**INVESTIGATION OF DEFENDANTS' ACTIVITIES**

63.    PEP has conducted an extensive investigation of the operations of Defendants, including by attending one or more public karaoke shows put on by Defendants and/or Defendants' employees, agents, representatives or contractors.

### a.    Traini's Activities

64.    Traini provides karaoke services to various venues in South Carolina, principally concentrated in the Myrtle Beach area, including the Causeway Grill and Raw Bar operated by CTHS.

65.    Upon information and belief, in order to provide services, rather than using original karaoke discs that he possesses (if he indeed possesses such discs), Traini relies upon one or more computer hard drives that store files representing karaoke accompaniment tracks.

66.    Upon information and belief, Traini relies upon at least one such computer hard drive described hereinabove.

67.    Upon information and belief, Traini created, or directed another to create, or otherwise acquired from a third party the files that are stored on his computer hard drive(s).

68.    Upon information and belief, Traini does not maintain a 1:1 correspondence relationship between his hard drive(s) and original discs he might have lawfully acquired.

69.    PEP or Slep-Tone did not authorize, cause, control, or know about the creation of the files stored on Traini's computer hard drive(s) at the time those files were so stored.

70.    Upon information and belief, many of the files stored on the Traini's computer hard drive(s) are representative of karaoke tracks originally created by Slep-Tone and are marked with the Sound Choice Marks.

71.    When played as intended using appropriate software, those files cause the Sound Choice Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent.

72.    Neither PEP nor Slep-Tone authorized Traini to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks or the Trade Dress.

73.    As such, the placement of the Sound Choice Marks and the Trade Dress upon Traini's computer files is a false designation of the origin of those computer files.

74.    At all times relevant to the causes of action stated herein, Traini has known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks and/or the Trade Dress is not authorized.

75.    Traini's files, which function as karaoke accompaniment tracks, are also counterfeits of genuine Sound Choice-branded tracks.

76.    A patron or unwitting customer of Traini, when confronted with the display of the Sound Choice Marks and the Trade Dress at one of Traini's shows, is likely to be confused into believing, falsely, that Slep-Tone or PEP created the tracks in use or authorized their creation.

77. Traini's use of the computer files representative of karaoke accompaniment tracks is commercial in nature because he is paid to provide access to and play those computer files and tracks at karaoke shows.

78. Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show is a commercial act for which Traini is compensated and which inures to his benefit.

79. Upon information and belief, Traini's piracy of accompaniment tracks is not limited to Sound Choice tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

80. The Sound Choice Marks were displayed on video monitors during various songs played by Traini.

81. PEP obtained photographs and videos of displays of the Sound Choice Marks by Traini at his shows.

82. Traini has not complied with PEP's media-shifting policy, and therefore his uses of the Sound Choice Marks were not authorized proper uses.

### b.    CTHS' Activities

83. CTHS hired Traini to provide commercial karaoke services at its bar on at least more than one (1) occasion.

84. CTHS has the right and ability to control whether its contractors use authentic or counterfeit materials to provide services.

85. PEP informed CTHS of the infringing and counterfeit character of CTHS' contractor's karaoke accompaniment tracks. *See* Exhibit A.

86. PEP offered CTHS the opportunity to enter into its Verified Compliance Safe Harbor Program, which is a free program that protects venues from liability for the acts of its contractors in exchange for requiring its contractors to provide information about their karaoke systems to enable PEP to assess whether those contractors are operating legally. *See id.*

87. PEP also provides a certification program to karaoke operators as a means by which venues can determine, without significant inquiry, whether the karaoke operator they wish to hire is using authentic materials.

88. As a result of PEP's efforts, CTHS has actual knowledge of the infringing and counterfeit nature of Traini's karaoke materials.

89. Despite that knowledge, CTHS refused to terminate Traini's services.

90. Despite that knowledge, CTHS continued to receive a financial benefit from the provision of infringing karaoke services at its establishment by Traini, through the attraction of paying patrons to its establishment.

91. As such, CTHS operated and continues to operate in actual or apparent partnership with Traini, in a symbiotic relationship from which both benefitted and continue to benefit.

92. Therefore, CTHS is liable for the acts of trademark infringement directly engaged in by Traini on CTHS' premises or for its benefit.

**ACTIVITIES OF THE NON-PARTY VENUES, BARS AND RESTAURANTS**

93. Upon information and belief, various non-party venues, bars and restaurants have hired Traini, his employees, agents, representatives or contractors to provide commercial karaoke services at their establishments.

94.     PEP reserves the right to amend this Complaint to add these venues, bars and restaurants in a manner consistent with the Federal Rules of Civil Procedure.

95.     Similar to CTHS, the non-party venues, bars and restaurants have engaged Traini to provide karaoke services at their establishments, or retained Traini as a provider at their establishments.

96.     The non-party venues, bars and restaurants each have the ability to control whether or not Traini engages in trademark infringement and unfair competition when providing karaoke services at their establishments.

97.     The non-party venues, bars and restaurants have received a financial benefit from the provision of infringing karaoke services at their establishments by Traini, through the attraction of paying patrons to their establishments.

98.     As such, each of the non-party venues, bars and restaurants are operating in actual or apparent partnership with Traini, in a symbiotic relationship from which both benefit.

99.     Each of the non-party venues, bars and restaurants are liable for the acts of trademark infringement directly engaged in by Defendant on their respective premises or for their benefit.

## DAMAGES

100.     Traini's unauthorized use of PEP's trademarks has damaged PEP.  Traini has enjoyed years of revenues attributable in substantial part to his use of counterfeit Sound Choice-branded karaoke tracks to provide karaoke services for money.

101.     Traini's illicit activities have also allowed him to compete unfairly against PEP's legitimate customers by lowering the cost of doing business through piracy of the music materials he uses.

102.    Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which Traini operates by helping to crowd higher-cost but legitimate operators out of the market.

103.    Traini's acts deprived PEP of revenue by discouraging legitimate operators from investing in legitimate Sound Choice-branded products.

104.    CTHS' unauthorized use of and benefit from the use of the Sound Choice Marks have damaged PEP both in the aggregate and individually.

105.    Defendants have damaged PEP in an amount to be proven at trial, but not less than One Hundred Thousand and no/100 Dollars ($100,000.00).

106.    Moreover, by exerting illegitimate and unfair pressure upon the market for karaoke services in this State and judicial district through the use of pirated material belonging to PEP and to other manufacturers, Defendants have cost PEP in excess of One Hundred Thousand and no/100 Dollars ($100,000.00) in revenue from legitimate sources crowded out of the market by Defendants' piracy.

**FIRST CLAIM FOR RELIEF**
**TRADEMARK AND TRADE DRESS INFRINGEMENT**
**UNDER § 15 U.S.C. 1114**
**(Against Traini)**

107.    PEP realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

108.    Traini used, authorized and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, or both, in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress,

or both, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, or both, during the provision of those services.

109.    Traini's use of the Sound Choice Marks or the Trade Dress, or both, was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

110.    PEP did not license Traini to manufacture or acquire reproductions, counterfeits, or copies, or to use the Sound Choice Marks or the Trade Dress, or both, in connection with the provision of his services.

111.    Traini's use of the Sound Choice Marks or the Trade Dress, or both, is likely to cause confusion, or to cause mistake, or to deceive customers and patrons at the venues in which Traini performs into believing that the services those customers are receiving are being provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

112.    Traini's acts were willful and knowing.

113.    PEP has been damaged by the infringing activities of Traini.

114.    Unless enjoined by the Court, Traini's infringing activities as described above will continue unabated and will continue to cause harm to PEP.

**SECOND CLAIM FOR RELIEF**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**
**(Against Traini)**

115.    PEP realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

116.    On each occasion when Traini caused or permitted a Sound Choice-branded accompaniment track to be played during a karaoke show, Traini caused or permitted the display

of the Sound Choice Marks or the Trade Dress, or both, in connection with Traini's karaoke services.

117.    The display of the Sound Choice Marks, the Trade Dress, or both, is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP sponsored or approved Traini's services and commercial activities.

118.    The display of the Sound Choice Marks, the Trade Dress, or both, is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by PEP and legally purchased or otherwise licensed by Traini for use in providing karaoke entertainment services.

119.    Traini's use of the Sound Choice Marks, the Trade Dress, or both, in this fashion would have inured to the benefit of PEP if Traini had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring the counterfeit copies, in that PEP would have received revenue from such sales.

120.    Because PEP has been denied this revenue, it has been damaged by Traini's activities.

121.    On each occasion when Traini caused an accompaniment track pirated from another manufacturer to be played during a karaoke show, Traini caused the display of the words, names and symbols of the other manufacturer in connection with Traini's karaoke services.

122.    Traini's use of those words, names and symbols falsely designates the other manufacturer as the origin of the pirated track, when in fact the pirated copy was made or acquired by Traini or another unauthorized provider.

123.    The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Traini acquired in a legitimate manner.

124.    The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and legally purchased or otherwise licensed by Traini.

125.    Traini's use of the false designations of origin in this fashion damages PEP by enabling Traini to provide karaoke services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers.

126.    The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

127.    Because PEP has been denied this revenue, it has been damaged by Traini's false designations of origin relating to other manufacturers.

128.    Unless enjoined by the Court, Traini's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT**
**UNDER S.C. CODE ANN. §§ 39-5-20, et. seq.**
**(Against Traini)**

129.    PEP realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

130.    The conduct of Traini as described above constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, and such conduct, therefore, violates the South Carolina Unfair Trade Practices Act., S.C. Code Ann. §§ 39-5-20, *et. seq.*

131.    Traini's use of the Sound Choice Marks or the Trade Dress, or both, is likely to cause confusion, or to cause mistake, or to deceive Traini's customers and patrons into believing that Traini's services are being provided with the authorization of PEP and that Traini's music libraries contain bona fide Sound Choice accompaniment tracks.

132.    Traini's conduct also affects the public interest, is capable of repetition and, upon information and belief, has been repeated on numerous occasions as evidenced by the various shows Traini performed and continues to perform.

133.    As a direct and proximate result of Traini's acts of infringement, PEP has suffered an ascertainable pecuniary loss, to wit: the loss of revenue associated with sales or distribution of compact discs to KJs or operators, commensurate with the demand for the contents of those discs, which revenue would have been received but for Traini's acts in creating or acquiring counterfeits of PEP's accompaniment tracks.

134.    As the direct and proximate result of the unfair methods of competition and unfair or deceptive acts and practices of Traini, PEP has sustained injury and is entitled to recover actual damages in an amount to be proven at trial.

135.    Traini's use or employment of the unfair methods of competition and unfair or deceptive acts or practices was a willful and knowing violation of S.C. Code Ann. §§ 39-5-20, et. seq., and, as a result, PEP is entitled to recover from Traini three (3) times the actual damages that it has sustained under S.C. Code Ann. § 39-5-140.

136.    PEP is further entitled to recover its reasonable attorney's fees and court costs from Traini under S.C. Code Ann. § 39-5-140.

**FOURTH CLAIM FOR RELIEF**
**TRADEMARK AND TRADE DRESS INFRINGEMENT**
**UNDER § 15 U.S.C. 1114**
**(Against CTHS)**

137.    PEP realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

138.    CTHS knowingly directly benefited from the use of, and through Traini, used a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, or both, in connection with the provision of services including karaoke services, by displaying and permitting to be displayed the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, or both, during the provision of those services.

139.    CTHS' use of the Sound Choice Marks or the Trade Dress, or both, was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

140.    PEP did not license CTHS to manufacture or acquire reproductions, counterfeits, or copies, or to use the Sound Choice Marks or the Trade Dress, or both, in connection with the service provided at its establishment.

141.    Use of the Sound Choice Marks or the Trade Dress, or both, in the manner attributable to CTHS is likely to cause confusion, or to cause mistake, or to deceive CTHS' customers and patrons into believing that the services those customers are receiving are being

provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

142.    CTHS' acts were willful and knowing.

143.    PEP has been damaged by the infringing activities of CTHS.

144.    Unless enjoined by the Court, CTHS' infringing activities as described above will continue unabated and will continue to cause harm to PEP.

## FIFTH CLAIM FOR RELIEF
## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)
### (Against CTHS)

145.    PEP realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

146.    On each occasion when CTHS permitted a Sound Choice-branded accompaniment track to be played during a karaoke show, CTHS permitted the display of the Sound Choice Marks or the Trade Dress, or both, in connection with Traini's karaoke services.

147.    The display of the Sound Choice Marks, the Trade Dress, or both, is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP sponsored or approved CTHS' services and commercial activities.

148.    The display of the Sound Choice Marks, the Trade Dress, or both, is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by PEP and legally purchased or otherwise licensed by Traini and/or CTHS for use in providing karaoke entertainment services in CTHS' establishment.

149.    CTHS' use of the Sound Choice Marks, the Trade Dress, or both, in this fashion would have inured to the benefit of PEP if Traini had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring the counterfeit copies, in that PEP would have received revenue from such sales.

150.    Because PEP has been denied this revenue, it has been damaged by CTHS' activities.

151.    On each occasion when CTHS permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, CTHS permitted the display of the words, names and symbols of the other manufacturer in connection with Traini's karaoke services.

152.    The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Traini acquired in a legitimate manner.

153.    The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and legally purchased or otherwise licensed by Traini.

154.    CTHS' use of the false designations of origin in this fashion damages PEP by enabling CTHS, through Traini, to provide karaoke services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers.

155.    The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

156.    Because PEP has been denied this revenue, it has been damaged by CTHS' false designations of origin relating to other manufacturers.

157.    Unless enjoined by the Court, CTHS' unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

### SIXTH CLAIM FOR RELIEF
### VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### UNDER S.C. CODE ANN. §§ 39-5-20, et. seq.
### (Against CTHS)

158.    PEP realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

159.    CTHS hired Traini to provide commercial karaoke services at its establishment, and it had the right and ability to control Traini's use of authorized or counterfeit materials for said commercial purposes.

160.    CTHS permitted Traini to engage in acts of infringement of the Sound Choice Marks and the Trade Dress, in derogation of PEP's common law and statutory rights in those marks.

161.    Traini's acts of infringement occurred during the conduct of trade or commerce, from which CTHS derived an economic benefit.

162.    The conduct of CTHS as described above constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, and such conduct, therefore, violates the South Carolina Unfair Trade Practices Act., S.C. Code Ann. §§ 39-5-20, *et. seq.*

163.    CTHS' enabling of Traini's use of the Sound Choice Marks or the Trade Dress, or both, is likely to cause confusion, or to cause mistake, or to deceive CTHS' customers and patrons into believing that Traini's services are being provided with the authorization of PEP and that Traini's music libraries contain bona fide Sound Choice accompaniment tracks.

164.    CTHS' conduct also affects the public interest, is capable of repetition and, upon information and belief, has been repeated on numerous occasions as evidenced by the various shows Traini performed and continues to perform at CTHS' establishment.

165.    As a direct and proximate result of CTHS' acts of infringement, PEP has suffered an ascertainable pecuniary loss, to wit: the loss of revenue associated with sales or distribution of compact discs to KJs or operators, commensurate with the demand for the contents of those discs, which revenue would have been received but for CTHS' acts in enabling Traini's infringing activities.

166.    As the direct and proximate result of the unfair methods of competition and unfair or deceptive acts and practices of CTHS, PEP has sustained injury and is entitled to recover actual damages in an amount to be proven at trial.

167.    CTHS' enabling of such unfair methods of competition and unfair or deceptive acts or practices was a willful and knowing violation of S.C. Code Ann. §§ 39-5-20, et. seq., and, as a result, PEP is entitled to recover from CTHS three (3) times the actual damages that it has sustained under S.C. Code Ann. § 39-5-140.

168.    PEP is further entitled to recover its reasonable attorney's fees and court costs from CTHS under S.C. Code Ann. § 39-5-140.

## PRAYER FOR RELIEF

WHEREFORE, PEP prays for judgment against Defendants, jointly and severally, and that the Court:

A.    Find that Defendants have committed acts of infringement, including, but not limited to counterfeiting, of the federally registered Sound Choice Marks and of the Trade Dress;

B.    Find that Defendants have engaged in unfair competition detrimental to PEP in violation of 15 U.S.C. § 1125(a);

C.    Find that Defendants have engaged in unfair methods of competition and unfair or deceptive acts or practices detrimental to PEP in violation of the South Carolina Unfair Trade Practices Act., S.C. Code Ann. §§ 39-5-20, *et. seq*.;

D.    Enter judgment against Defendants, jointly and severally, and in favor of PEP on all causes of action;

E.    Find that Defendants' activities were in all respects conducted willfully and for profit;

F.    Award to PEP Defendants' profits and the damages sustained by PEP because of Defendants' conduct in infringing the Sound Choice Marks, the Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting in an amount up to Two Million and no/100 Dollars ($2,000,000.00) per mark infringed, per Defendant and in any event in an amount not less than Twenty Five Thousand and no/100 Dollars ($25,000.00) for each karaoke system operated by Defendants, and not less than Fifty Thousand and no/100 Dollars ($50,000.00) for each establishment in which the infringement occurred;

G.    Award to PEP treble, punitive, or otherwise enhanced damages, as available, for Defendants' acts of willful infringement;

H.      Order all computer disks, drives, or other media belonging to Defendants, which media contain illegal counterfeits of the Sound Choice Marks, of the Trade Dress, or of marks belonging to other manufacturers, to be delivered up for destruction;

I.       Grant PEP preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks and the Trade Dress by Defendants;

J.       Grant PEP preliminary and permanent injunctive relief against further false designations of origin by Defendants with respect to words, names, and symbols associated with other manufacturers;

K.      Award PEP its costs of suit and attorneys' fees, to the extent not awarded above; and

L.       Grant PEP such other and further relief as justice may require.

Respectfully submitted this the 2nd day of July, 2015.

JOLLEY LAW GROUP, LLC


 *s/Michael C. Cerrati*
Michael C. Cerrati, Esq. (Fed. ID No. 10488)
Kelly M. Jolley, Esq. (Fed. ID No. 9578)
P.O. Box 22230
Hilton Head Island, SC 29925
843-681-6500 office
877-513-3444 fax
mcc@jolleylawgroup.com
*Attorneys for Plaintiff*